# Case No. 1,694.

BOUDEREAU et al. v. MONTGOMERY et al.

[4 Wash. C. C. 186.][1]

Circuit Court, D. Pennsylvania. Oct. Term, 1821.

DEPOSITION—EXECUTION OF COMMISSION—RETURN —EVIDENCE — COMPETENCY — EXECUTORS AND ADMINISTRATORS — POWERS — DEPOSITION—WHO MAY USE — EVIDENCE AS TO PEDIGREE — TESTIMONY OF DECEASED WITNESS.

1. A commission, directed to A, to be executed in one county, cannot be executed by him in another. The commissioner ought to state when and where the depositions were taken. He acts under a special authority. Depositions were rejected on the ground of their being obnoxious to those exceptions.
[See Rhoades v. Selin, Case No. 11,740.]

2. A suit in equity by a number of plaintiffs, about one hundred, against A and wife and B; A and B being the administrators of W, and the wife claiming as the sole heir of W. The

---

[10] [From 7 Am. Law Reg. (N. S.) 539.]

[11] [From 7 Am. Law Reg. (N. S.) 539.]

[1] [Originally published from the MSS. of Hon. Bushrod Washington, Associate Justice of the Supreme Court of the United States, under the supervision of Richard Peters, Jr., Esq.]

plaintiffs claim to be the heirs. Depositions taken in an ejectment by five of the plaintiffs against A, cannot be read in evidence in this suit, the plaintiffs not being the same.

[See Rutherford v. Geddes, 4 Wall. (71 U. S.) 220.]

3. One administrator may release, or dispose of the estate, without the other.

[See Wintermute v. Redington, Case No. 17,-896.]

4. No one can take the benefit of a verdict, or of depositions, who would not have been prejudiced by them had they been otherwise.

[See Humphries v. Tench, Case No. 6,873.]

5. But depositions taken between other parties on the same point, may be read to prove pedigree; as hearsay, or declarations, the witnesses being dead.

[See Stein v. Bowman, 13 Pet. (38 U. S.) 209; Blackburn v. Crawford, 3 Wall. (70 U. S.) 175; Banert v. Day, Case No. 836; Chirac v. Reinecker, 2 Pet. (27 U. S.) 613; Clara v. Ewell, Case No. 2,790. Disapproved in Hall's Deposition, Case No. 5,-924.]

In equity. The plaintiffs, about eighty or one hundred in number, assert themselves to be the next of kin, on the paternal side, to Charles White, who died intestate in the city of Philadelphia some time in the month of January in the year 1816. The intestate was one of the numerous French neutrals, as they were called, who were deported from Nova Scotia in the year 1755 by order of the British government. The bill alleges that he was the son of Charles White, who died, leaving two sons, Francis and the intestate, and four brothers and two sisters, the ancestors of the plaintiffs. That the two sons died intestate and without issue, and that the female defendant is the only child of Mrs. Blanchard, the sister of the intestate's mother. The defendants, Mr. Montgomery and Mr. Cross, are the administrators of Charles White, the intestate. The bill claims six-sevenths of the real and personal estate of the intestate. The answer denies that Charles White, the father, had either brothers or sisters, or left any other relations than his two sons aforesaid, and denies that the plaintiffs are in any manner related to the family of the intestate. At the hearing of the cause, the plaintiffs ordered in evidence certain depositions taken under a commission to Louisiana, to be executed by P. in the parish of Assumption. Another commission was directed to A B, to be executed at Iberville, and a third to C D, to be executed in the parish of Ascension, but no return was made to the two last commissions, nor do they appear to have been executed. Under the commission directed to P. sundry depositions were taken by him at Iberville, as appears by his return; but it is not stated when, or at what place, the other depositions were taken. An objection was taken by the defendants to the execution of the whole commission: as to the depositions taken at Iberville, because the commission directed to P. was to be executed by him in the parish of Assumption, and not at Iberville; and to the other depositions taken under the same commission, because the commission has not stated when or where they were taken. Objections were also taken to some parts of the depositions, in case the court should permit them to be read, being answers to leading interrogatories.

WASHINGTON, Circuit Justice. As to the last objections, that would be attended to by the court upon the report of the master, to whom it might be proper to refer the depositions, to inquire whether any, and which of the interrogatories are leading. The objections to the execution of the commission strike at the entire depositions, and being in my opinion well founded, the depositions themselves must be suppressed. The commissioners act under a special authority, which it is not only their duty to pursue, but it should be made to appear to the court by their own showing, that this authority was pursued. Whatever facts in relation thereto are stated in their report, the court is bound prima facie to give credit to; but the court cannot presume that they have duly executed their authority, when they are themselves silent upon that subject. It should particularly appear when and where the depositions were taken. As to the depositions taken at Iberville by P. not only out of his district, but within the district of another commissioner, it is impossible that they can be supported, any more than if they had been taken by a person not authorised by the court to take them. And having thus furnished the court with evidence of his total disregard of the authority given to him in those instances, I am well warranted in doubting at least, whether he has been more attentive to it in others where he is silent as to the place at which the commission was executed.

The plaintiffs' counsel then offered in evidence depositions taken under a commission to Baltimore, in an ejectment for the real estate of the intestate, brought in the supreme court of this state by some of the present plaintiffs, against the defendants, Montgomery and wife. These were also objected to, upon the ground that they were res inter alios acta, and that they were inadmissible even to prove pedigree, (the purpose for which they are offered) having been taken post litem motam. Phil. Ev. 177, 178, 222, 226, 230, 233; Gilb. Ev. 61, 31, 33; The Berkeley Peerage Case, 4 Camp. 401; Hayward v. Firmin, decided in 1766, cited in the Case of the Berkeley Peerage; King v. Cotton, 3 Camp. 444; Whitelocke v. Baker, 13 Ves. 511.

On the other side were cited Goodright v. Moss, Cowp. 591; 2 Hen. & M. 55; Kirby, 258; Gilb. Ev. 65; 3 Atk. 415; [Massey v. Leaming] 4 Dall. [4 U. S.] 123; Barr v.

Gratz, 4 Wheat. [17 U. S.] 220; 2 Phil. Ev. 267, 268; Bull. N. P. 233; Duke of Athol's Case, 2 Strange, 1151; 2 Phil. Ev. 234, 269; 1 Vern. 413; 2 Hen. & M. 193; 2 Munf. 167; [Davis v. Wood] 1 Wheat. [14 U. S.] 6; [Queen v. Hepburn] 7 Cranch [11 U. S.] 290; 1 Wash. [Va.] 123; 2 Wash. [Va.] 146, 148.

WASHINGTON, Circuit Justice. As depositions, the evidence is inadmissible, inasmuch as it was taken in a cause between different parties from those who are now before this court, though in relation to the same question. Were the plaintiffs the same, I think the objection would not hold, on the ground that Mr. Cross was not a party to the suit in which the depositions were taken, since Montgomery was, and as representing his co-administrator, as well as the estate of the intestate, he had every opportunity of cross-examining the witnesses. The executors or administrators of the deceased are considered in law as but one person, representing the testator; and the acts done by any one of them, which relate to the estate of their testator or intestates, are deemed the acts of all, inasmuch as they have a joint and entire authority over the whole. Godol. 134; Rolle, Abr. 924; 2 Ves. Jr. 265; Shep. Touch. 484, 485. A release of a debt, or judgment confessed by one executor, binds his companions. 1 Dyer, p. 23, pl. 146. Surely then there is a privity of interest and estate between executors or administrators, at least as apparent as between several remainder men claiming in succession under the same deed or will, in which case, a subsequent remainder man may give in evidence, in an action by or against him, a verdict rendered in favour of a prior remainder man; for they both claim under the same deed. Phil. Ev. 227; 1 Ld. Raym. 730; Com. Dig. "Evidence," A 5; Bull. N. P. 232. But the plaintiff not being the same, and it being perfectly clear that, if the depositions had been in favour of the defendants in that cause; as if, for example, they had proved Mrs. Montgomery to be the sole heir of the intestate; they could not have been read against such of the present plaintiffs as were not parties to that suit, neither can they be used by these plaintiffs against the defendants on that suit. For I conceive, that if any rule of law can be considered as established, that is, which Gilbert lays down in his treatise on Evidence, p. 28, "that no one can take benefit by a verdict (or deposition) who had not been prejudiced by it had it been contrary." See, also, Bull. N. P. 232; Duchess of Kingston's Case [20 Howell, St. Tr. 355]; Hardw. 472. But I am of opinion that the depositions are admissible as declarations in relation to pedigree, and are at least as satisfactory to prove that matter as hearsay or reputation.

It is admitted by the defendants' counsel, that, as a general rule, hearsay and reputation may be given in evidence to prove a pedigree, but that a special verdict finding a pedigree, or depositions taken to prove it in one cause, cannot be given in evidence in another cause, between different parties, because they are only equal to declarations made after the question of pedigree had become the subject of controversy, and consequently after an improper bias may have been impressed upon the mind of the witness, or person making the declaration. This exception from the admitted general rule is taken in the case of Whitelocke v. Baker, 13 Ves. 511, and in the Berkeley Peerage Case, 4 Camp. 401. These cases are of modern date, the latter having been decided in the house of lords in the year 1814. They cannot, therefore, be considered as authorities to control the judgment of this court; and I feel perhaps less disposed to yield an assent to the reasoning on which they proceed, in consequence of impressions made upon my mind from the time I was a student of law, until these cases were cited, that the long and well established rule was otherwise than what they state it to be. In the case of the Berkeley Peerage, two decisions only are referred to, and these at nisi prius. The first by Chief Baron Reynolds, in the year 1730, in support of the exception to the general rule; and the other in 1766, by Lord Camden; which, being much later in date, overrules the former case, and establishes the rule, so far as a nisi prius decision could have that effect.

Buller, in his Nisi Prius, which was published before the American Revolution, states as an exception to the general rule, that, wherever hearsay and reputation are evidence, as in questions of pedigree, a special verdict between other parties, stating a pedigree, is evidence to prove a descent. Bull. N. P. 233. He mentions the Duke of Athol's Case, 2 Strange, 1151, in which Mr. J. Wright stated this to be the rule, and that his opinion in that respect was generally approved, although the determination of the other judges was contrary. But why were they contrary? Not because the rule, as laid down by Mr. J. Wright, was not considered the correct one, but because it did not appear, in that case, but that the witnesses upon whose testimony the verdict was found, might have been examined in the case under consideration; and there can be no doubt but that depositions taken in one case, cannot be read in another where the parties are different, even in a question of pedigree, unless the witnesses are shown to be dead. But it may fairly be concluded from the reasons which govern the majority of the court, that if this proof had been given, there would have been no difference of opinion between the judges. The case of Goodright v. Moss, Cowp. 591, is not otherwise important upon this point, than as it gives us the opinion of Lord Mansfield, who, although deeply learned in the civil law, and by no means disinclined to adopt its principles upon all

proper occasions, was not influenced by the distinction between evidence of declarations ante, and post litem motam: and although Mr. Justice Aston concurs in awarding a new trial upon another ground, he expresses no dissent from the opinion of Lord Mansfield, or which can be construed to favor this distinction. It is stated by some of the judges in the Case of the Berkeley Peerage, that the rule at nisi prius, as far back as they could recollect, had been to exclude evidence of declarations made after a controversy had commenced. I must therefore take the fact as it is stated, that this had been the experience of those judges; but I must also believe that the rule was unknown to Mr. Justice Buller, as well as to the judge who dissented from the opinion delivered in the above case. This point is, I presume, now settled in England by the two decisions above alluded to; but the question is, how has it been understood in this country, before and since the American Revolution? As the nisi prius decisions alluded to by the judges in the Berkeley Peerage Case were never in print, it may fairly be presumed that they were unknown in this country, and consequently they could not have influenced the decisions of the courts of the different states. The only authoritative rule known was that which was laid down by Mr. Justice Buller, and by Mr. Justice Wright in the Duke of Athol's Case. I have had no opportunity of looking into the American cases; but I am strongly inclined to think, from expressions to be met with in many of the state decisions, that the rule of post litem motam has never been recognized in the United States. See the cases cited by the plaintiffs' counsel on this point, to which I add the case of Ross v. Cooley, 8 Johns. 128; 1 Yeates, 17, 152; Swift, Ev. 122. It is not without great diffidence that I venture to dissent from the reasoning of the judges in the Berkeley Peerage Case. But it seems to be rather artificial than solid when directed against the admissibility of the evidence; although I acknowledge that the possibility of an undue bias having been produced by the existence of the controversy, might with propriety be urged against the credit to be given to the evidence, where the proofs in the cause are contradictory, and to be weighed. I am apprehensive that great mischief and injustice might be the consequence of excluding the only species of evidence, which circumstances, not within the control of the parties interested, may have left to them; on the ground of a presumed bias created by an existing or even presumed controversy. I am persuaded that, carried to the extent stated in that case, the rule would exclude hearsay and reputation in a great majority of cases, where it can alone be resorted to, to prove pedigree. I am of opinion that upon proof being made of the death of the witnesses, the depositions may be read.

NOTE [from original report]. In a case where a controversy had arisen, or was expected to arise, between parties, concerning the validity of a deed, against which one of the parties claimed, but no controversy was then expected to arise about the heirship, a letter then written, stating the pedigree of the claimants, was not considered as excluded by the rule of law, which declares that declarations relating to pedigree, made post litem motam, cannot be given in evidence. [Elliott v. Peirsol] 1 Pet. [26 U. S.] 337.