DINAH CARTER *vs.* W. J. MONTGOMERY and others.

## April Term, 1875.

RESULTING TRUST ARISES AT THE TIME OF CONVEYANCE UPON CONSIDERATION AND INTENT.—A resulting trust arises at the time the conveyance is made, and, if there be no valuable consideration at that time, or if he who pays the consideration manifests an intention that the title shall abide beneficially in the grantee, the resulting trust does not arise.

GIFT IN CONSIDERATION OF WRONG DONE.—If a gift be in consideration of wrong done, such as seduction or past illicit cohabitation, equity will not interfere to deprive the donee of the legal title.

MARRIAGE PROHIBITED BY STATUTE VOID.—A marriage between a white person and a person of mixed blood to the third generation, inclusive, being prohibited by statute, is void *ab initio*.

EVIDENCE OF HEARSAY IN PEDIGREE.—Hearsay from other than members of the family, and public repute, is admissible to prove the body of the tradition touching pedigree, but not to establish a specific fact, such as place of birth, or death, or shade of color.

*E. H. East & S. J. Henderson,* for the Matherleys.

*H. E. Jones,* for the Bruners.

*T. M. Steger,* for Bate.

THE CHANCELLOR:—The facts of this case disclose a curious episode of the civil war, and bring to the surface, stirred up by that mighty commotion, some of the fetid material which usually lies buried at the bottom of the great human ocean.

In the year 1862, Henry Bruner, occupying a lucrative position in the quartermaster's department of the army of the Cumberland, at Nashville, and with a wife and children at his northern home, persuaded a young girl named Myra Thomas, then living with her grandmother, to leave her home and cohabit with him as his wife. She was the more easily seduced, perhaps, by reason of the fact that she herself was the illegitimate child of one Elzira Sevier. Her mother had, however, when Myra was only two or three years old, intermarried with one Matherley, by whom she had several children, who are now claiming the land in controversy as the heirs of their half-sister, Myra, their

mother having died in December, 1863. After Elzira's marriage Myra was taken and raised by her grandmother, in Nashville, and only visited occasionally her mother and step-father, at their home in Sumner county. The evidence shows that Bruner and Myra passed among her mother's family and connections as man and wife, and with their neighbors in Nashville, boarding part of the time, and keeping house during the residue of the period of cohabitation. Dinah Carter, the original complainant in this cause, was a free woman of color, and the keeper of an assignation house, and seems to have been, though precisely how nowhere appears, implicated in bringing about the illicit cohabitation of Bruner and Myra. At any rate, on the 12th of August, 1864, the Hendersons conveyed the land in controversy, consisting of about fourteen acres on the north side of Cumberland river, to the said Dinah Carter, for the consideration of $5,000, paid in cash. The money, it is agreed on all hands, was paid by Bruner. On the 15th of November, 1864, Dinah Carter, by deed reciting the like consideration, conveyed the land in fee to Myra Thomas, at the instance of Bruner. Shortly afterwards Bruner and Myra seem to have separated, and, on the 1st of March, 1865, she intermarried, in Sumner county, with the defendant James M. Garrett. Garrett and Myra lived together, in Sumner county, at the residence of Garrett's mother and grandmother, until the latter part of September, 1865, when they seem to have come, together with a young sister of Myra, to Nashville, and put up at a house on the land in dispute, then occupied by Kitty Garrett, an aunt of James M. Garrett, as a renter. In a few days thereafter Myra took her sister and went to the house of Dinah Carter, and, on the 30th of September, 1865, filed a bill against her husband for divorce, on the ground of cruel treatment. On the 2d of October, 1865, James M. Garrett followed her, to induce her to return with him, and, on her refusal, he killed her on the spot by shooting her several times with a revolver. He was caught and committed to jail for the murder,

but was afterwards released upon bond for his appearance, and not long subsequently left for parts unknown, and has never returned. Before his departure, on the 4th of April, 1867, he executed a power of attorney to the defendant W. J. Montgomery, authorizing him to sell the land in controversy to any person " who will purchase the same," and, on the 29th of August, 1868, Montgomery, under this power, sold and conveyed the land to the defendant Enoch Cunningham, for the consideration of $500, who afterwards sold to the defendant Bate, one of James M. Garrett's lawyers to defend him in the criminal prosecution, but, under an agreement with Bate, took and retained possession of ·the land until this litigation commenced, when he surrendered possession to a receiver appointed by the court. Who was in possession of the land when Cunningham bought, and under what claim of title, nowhere appears in the record.

The litigation in this case was commenced by Dinah Carter, by bill filed on the 14th of September, 1871, against Montgomery, Cunningham, Garrett, Bruner, and the unknown heirs of Myra Garrett, deceased, claiming that the land in controversy was bought from the Hendersons, by the complainant, with her own money, and that, not knowing how to write or read writing, she had been fraudulently deceived by Bruner into executing the deed to Myra Thomas. This bill was answered by Montgomery, "for himself and James M. Garrett," by Cunningham, by John F. Lewis and wife, Elizabeth, formerly Elizabeth Matherley, and the other Matherley children, as the heirs of Myra Thomas. Publication was made as to Bruner, who had returned to his northern home early in 1865, but no defence was ever put in by him. He died in 1872, and this and the cross-suit of the Matherleys, to be mentioned, were by consent revived against his wife and children, who then appeared and answered.

On the 30th of April, 1872, Lewis and wife, and the other Matherley children, filed a cross-bill, and, on the 16th

of January, 1874, an amended cross-bill, against Dinah Carter, Cunningham, Montgomery, Garrett, and Bruner, claiming the land as the heirs of Myra, and alleging that the said Myra was a white woman, and the said James M. Garrett was a negro or mulatto, of mixed blood within the third degree, and the marriage between them void under our statute law. All parties, including Bruner's wife and children, have filed answers, none of them, however, being either sworn to or signed by the defendants. The purchaser Bate has, also, been permitted to come in as a defendant and answer.

On the 30th of September, 1872, Dinah Carter seems to have filed an affidavit, purporting to be signed by her by making her mark, without any attesting witness, admitting, in substance, that the charge in her bill of fraudulent contrivance to induce her to execute the deed to Myra Thomas was a mistake of the draftsman, as well as the claim therein made of a right to the land, and that she had, in fact, no interest in the property. This paper is treated by the other litigants as a disclaimer of record of any interest in the litigation, and this, I presume, is the legal effect of the instrument treated as what it purports to be. She is not now represented by counsel. The affidavit cannot, of course, be looked to for any other purpose, and certainly not as evidence for or against any of the other litigants of any fact therein stated.

The answers of the non-resident adult defendants are put in, as we have stated, without being either sworn to or signed by such defendants. Counsel who accept such answers do so at their peril. The practice has no sanction in positive law, or the usage of courts of chancery. *Denison* v. *Bassford*, 7 Paige, 370; *Dumond* v. *Magee*, 2 Johns. Ch. 240; *Codner* v. *Hersey*, 18 Ves. 469.

Looking to the substance of the litigation, we find three sets of claimants to the land in controversy. The wife and children of Bruner claim the land upon the ground that, the purchase money having been paid by him, and the title

made to a stranger in blood, the latter took only the naked legal title, subject to a resulting trust in favor of Bruner, which descended to his heirs on his death. The claim of the Matherleys rests upon the assumption that the conveyance to Myra was made under such circumstances as to vest in her the beneficial interest; that the marriage between Myra and Garrett was void, he being of mixed blood within the prohibited degrees, and that they are, through their mother and by statute, the heirs of their illegitimate half-sister. The claim of Garrett, and those holding under him, depends upon the validity of the marriage and the provisions of the Code, § 2423.

That section of the Code is in these words: "When an illegitimate child dies intestate, without child or children, husband or wife, his real and personal estate shall go to his mother; and, if there be no mother living, then equally to his brothers and sisters by his mother, or descendants of such brothers and sisters." The course of descent under this section, as held by our supreme court, is first to the child or children of the illegitimate, if any there be, and, if none, then to the surviving husband or wife, as the case may be, if husband or wife survives, and, if not, then to the mother; and, if the mother be not living, then to his brothers or sisters by the mother, or their descendants. *Webb* v. *Webb*, 3 Head, 68. If the marriage of James M. Garrett and Myra Thomas was valid, any property of which she died seized or possessed went, under this statute, to him; and, if the marriage were void, to the Matherleys. This is not disputed.

The purchase money for the land in question was certainly advanced by Henry Bruner, but whether upon the original sale by the Hendersons, or only upon the subsequent conveyance to Myra, is not clear. The circumstances are strongly persuasive that the money for the original purchase was advanced by Bruner. In that event a resulting trust unquestionably arose in favor of Bruner. But the subsequent conveyance to Myra, made, as it was, at his

instance, would have been without any money paid on which to raise the trust, and could only be construed to be a gift, and the claim of Bruner's wife and children has. nothing to rest on.

If, however, it be conceded that the money was advanced by Bruner on the last conveyance, the law would, under the circumstances, presume that he intended a benefit to himself, and raise a trust accordingly. But, as this trust is a mere matter of equitable presumption, the presumption may be rebutted by any facts which negative it. The trust, all the authorities agree, can only arise at the time of the conveyance, and if, at that time, the person who pays the consideration manifests an intention that the title shall abide beneficially in the grantee, the resulting trust is gone forever. *Groves* v. *Groves*, 3 Y. & J. 172; *Hunt* v. *Moore*, 6 Cush. 1; *Gee* v. *Gee*, 1 Sneed, 395, 402; *Hoxie* v. *Carr*, 1 Sumn. 188. And the intention may be inferred from circumstances, as well as proved by express declarations. *Robertson* v. *Maclin*, 3 Hayw. 70; *Lyon* v. *Lyon*, 1 Tenn. Ch. 236, and cases cited.

The circumstances attending the conveyance in this case are strongly persuasive, if not absolutely conclusive, that, the conveyance was intended as a gift. In addition we have the testimony of two witnesses to express declarations. of Bruner, near the time of the conveyance, that he intended to give the property to Myra, because, being about to return home, he felt it his duty to provide for her. The testimony of one of these witnesses, who is a half-brother of the Matherleys, *ex parte paterna*, might not, if unsupported, have been conclusive. But the other witness is entirely disinterested, unimpeached, and his testimony free from exception, and disclosing the circumstances out of which the conversation with Bruner naturally arose. The counsel for the Bruners bases one of his strongest arguments in favor of his clients on the evidence of this witness.

"Sometime," says the witness, "in the latter part of 1864, Bruner told me that he had been cohabiting with

Myra about nineteen months; that he loved her better than any woman on earth; better than his own wife, who was a nice, good woman. He then had a deed in his hand. I did not read the deed, but Bruner told me that it was a deed conveying the land (in question) to said Myra. Bruner further said that he was going away from Nashville soon, and he intended to give said property to Myra, so that she would be comfortable the balance of her life, because he thought it was his duty to provide for her."

The counsel for Bruner's wife and children was not present at the taking of this deposition, and learning from the counsel of Montgomery and Garrett, who was present, that the witness detailed the circumstances under which this conversation took place more fully than, in the haste of taking the deposition, was actually set out therein, he took the testimony of the counsel as to these details, which, by agreement of parties, is made a part of the witness' deposition. The facts are that Myra had given the witness a package for Garrett, as to whom Bruner seems to have then entertained feelings of jealousy. He asked witness if the package was for Garrett, and the witness, from prudential motives, said it was for one of his own children. Thereupon Bruner said he was glad to hear it, and took a paper from his pocket and read it to him. It was a deed for the land, and Bruner said if the package had been for Garrett he would have destroyed it. "I then," says the counsel, "asked the witness if the deed was a direct deed from Bruner to Myra Thomas, and he said it was."

The argument based upon the deposition as thus amended is that Bruner intended to make a direct conveyance to Myra, but afterwards changed his mind; that the deed from Dinah Carter had then been executed, and that, never having carried out his intention of giving the property to Myra, the resulting trust still continues. The strength of the argument depends upon the fact that the witness says that the deed read to him by Bruner was a deed made by him. But the witness merely gives an affirmative answer to the

question whether the deed was not direct from Bruner to Myra. The point in the questioner's mind was, doubtless, to ascertain that the deed was direct from Bruner. The attention of the witness was probably to the point that the deed was direct to Myra. It is not at all probable that Bruner ever for a moment contemplated making a deed himself to Myra, to be recorded as a standing evidence against him of their connection. The deed from Dinah Carter contains her name only once, and that at the very commencement, and the name may have escaped the witness' attention. His impression that the deed which was read was from Bruner was, probably, an inference, not a fact.

Moreover—and this is the conclusive consideration—the circumstances demonstrate that the conversation between Bruner and the witness took place before the conveyance by Dinah Carter to Myra Thomas. The witness says the conversation was in the latter part of 1864, and Bruner told him, in that conversation, that he had been cohabiting with Myra about nineteen months. These dates render it morally certain, as the cohabitation is proved to have commenced about the end of the year 1862, that the conveyance to Myra had not then been made. Bruner, if he ever contemplated a direct conveyance in his own name, which is very improbable, must have changed his mind. He caused the conveyance to be executed in the mode actually adopted, and the conversations detailed, when considered in connection with the circumstances, leave no reasonable doubt on the mind that the intention on his part, at the time of the conveyance, was that the beneficial interest, as well as the title, should rest in Myra Thomas.

It is said, however, that Myra, in her divorce bill, which is sworn to, does not claim the ownership of any land. This is true, but neither does she assert affirmatively that she does not own any land. What she does say is that her husband " refuses to provide for her, and she is tired and destitute. She has some house furniture, two sets of furniture, all paid for herself." The bill may be considered as the

draft of the lawyer, and the failure to say anything about the land may have been due to ignorance or oversight. The omission, by itself, amounts to nothing, although, with other circumstances, it might have been very significant. If, for example, there had been evidence to show that Bruner continued to exercise control over, and receive the rents of, the land after the conveyance to Myra, her failure to make any claim would have gone far to negative her rights. But there is no such proof. On the contrary, the only positive evidence tends to show that Myra both claimed and rented the land. And in 1868 Bruner became a voluntary bankrupt, and, in making out a sworn schedule of his assets, declared that he had no lands whatever. There is a note in writing, on the certified copy of this schedule and oath, by the counsel of the Bruners, that it is excepted to "as incompetent." Considered as an exception to the certified record, or even to its contents as evidence, this is, of course, too vague. *Ingram* v. *Smith*, 1 Head, 412, 418 ; *Burton* v. *Driggs*, 20 Wall. 125, 133 ; *Camden* v. *Doremus*, 3 How. 515. But I know no reason why an affidavit made in a judicial proceeding is not competent evidence, against the party making it, of any admission contained in it.

I am clearly of opinion that the record satisfactorily shows that it was the intention of Bruner at the time, as the person advancing the purchase money of the land in question, that the beneficial interest under the deed should go, with the legal title, to Myra Thomas.

No point is made by the learned counsel of the Bruners against the validity of the deed upon the ground that the gift was based upon an illegal consideration. Nor, in fact, are the pleadings shaped for such an issue. The proof is, however, all one way—that the gift was for the wrong done, and for past cohabitation. Equity never interposes in such cases to deprive a party of the legal title. 1 Story's Eq. Jur. § 229 ; *Bivins* v. *Jarnagin*, Sup. Ct. Tenn., December term, 1874. And will even enforce securities given as the premium *pudicitiæ*. *Marchioness of Annandale* v. *Harris*,

2 P. W. 432; 3 Bro. P. C. 445; *Gray* v. *Mathias*, 3 Ves. 286.

The title of Myra to the property in dispute being settled, the rights of the other litigants turn upon the validity of the marriage with Garrett. The evidence is conclusive that Myra Thomas was a white woman of unmixed blood. Proof of color alone would be sufficient to raise a presumption of law in her favor, until overturned by opposing proof, of which there is none in this case. *Miller* v. *Denman*, 8 Yerg. 233. But the evidence identifies both her parents as white, common reputation being the only evidence, as a general rule, which can be produced in the case of illegitimates. *Ford* v. *Ford*, 7 Humph. 92. The evidence is equally clear that Garrett is of mixed negro blood. Our statute is: "Marriage cannot be contracted between a white person and a negro, mulatto, or person of mixed blood to the third generation, inclusive." Code, § 2437; 1870, 2d session, 39, 1. It is not denied, and is too plain for argument, that the prohibition of a statute makes a marriage within it void *ab initio*. Bishop on Mar. and Div. §§ 46, 223.

The question to be determined is one of fact: Is the defendant Garrett within the third degree, inclusive, from the pure negro? The evidence is partly direct, partly by reputation. The facts too clear for dispute are these: James Garrett, a white man, removed from North Carolina to Sumner county in this state early in the century, and died about 1833. By his will he emancipated two slaves, Sarah and Esther, of whom he was the reputed father, dividing between them the farm on which he resided, on Drake's creek, in Sumner county, and where they continued afterwards to live. Esther died sixteen or eighteen years ago. Sarah died near the commencement of this suit, at about the age of seventy years, having had several children, without ever being married, of whom Paralee is one. Paralee is now about fifty-five years of age, and has had two illegitimate children, of whom the defendant James M. Garrett is the eldest. The proof, direct and by reputation,

**15**

makes it nearly certain that the father of James M. Garrett was a white man; and that his mother, Paralee, was also the daughter of a white man; and, as we have seen, his grandmother, Sarah, was the daughter of a white man. If, now, Sarah's mother was a full negress, James M. Garrett would be of mixed blood exactly in the third degree. If Sarah's mother was not a full black, but of mixed blood herself, then James M. Garrett would be in the fourth, or other remote degree, and so out of the prohibition of the statute, and the marriage would be valid.

Sarah, it will be remembered, died in 1871, at the age of about seventy years, and must, therefore, have been born near the commencement of the century. Her mother, the proof on both sides shows, must have died when Sarah was still an infant, or small child. The proof does not fix the date when James Garrett removed to this state from North Carolina. One of the witnesses, whose deposition was taken in 1874, says he was then sixty-eight years of age, was born and raised on Drake's creek, in the vicinity of the Garretts, and has known them ever since he can recollect. This witness says he learned from his parents that a certain negro woman, a slave of James Garrett, whose name he does not recollect, and whom he saw a dozen times more than sixty years ago, was the mother of Sarah. He says she was, and was reputed to be, a full black negro. Another witness, sixty years of age, born and raised in the neighborhood, never saw Sarah's mother, but learned from his wife's parents, both of whom are dead, that they had seen her, and she was a full-blooded negro, and was named Dolly. Another witness, seventy-two years old, who had lived within a mile and a half of the Garretts for forty years, states that Sarah's mother was reputed by all who knew her to be a full-blooded black negro woman. Another witness, thirty-two years of age, who has known the Garretts since he can recollect, says that Sarah's mother was said to be a black negro by all the old people he ever heard talk about her.

On the other side two witnesses were introduced. One of them, an old neighbor, who says nothing about the public reputation or common talk, but undertakes to detail what an old friend of the Garretts, who died in 1855, said on the occasion of a fight between one of the Garrett children and a white boy, namely, that the Garretts were nearer white than was supposed, and that the mother of Sarah was a yellow woman. The other witness is Paralee, the mother of James M. Garrett, who states, as upon information derived from Sarah, Esther, and other members of the family, that Sarah's mother was a mulatto named Melissa, who never came to this state, but died in North Carolina when Sarah was quite young.

Conceding the competency of all of the foregoing evidence, the conflict is irreconcilable, and the task of the court in drawing a satisfactory deduction somewhat difficult. Before undertaking this task, let us see what are the principles of law which must guide us.

In England it is now well settled that hearsay evidence is resorted to in matters of pedigree, upon the principle of declarations forming a part of the *res gestœ*, and therefore original evidence, upon the ground of the interest of the declarants in knowing the connections of the family. The rule is, consequently, restricted to the declarations of deceased persons who were related by blood or marriage to the person from whom the descent is claimed, and general repute in the family proved by a surviving member. *Vowles* v. *Young*, 13 Ves. 140; *Whitelocke* v. *Baker*, 13 Ves. 514; *Doe* v. *Griffin*, 15 East, 293. This doctrine is comparatively recent, even in that country, and, although the weight of American authority is tending in the same direction, there are many respectable decisions which make no such limitations. *Banert* v. *Day*, 3 Wash. C. C. 243; *Bondereau* v. *Montgomery*, 4 Wash. C. C. 186; *Jackson* v. *Cooley*, 8 Johns. 128; *Pegram* v. *Isabell*, 2 Hen. & M. 193; *Walkup* v. *Pratt*, 5 Har. & J. 51. It is obvious that while the English rule may be most consonant to sound principle,

and may answer the ends of justice in a dense population and settled community, yet it scarcely suffices in a sparsely inhabited country with a migratory and rapidly changing population. It would be utterly inadequate in matters relating to a slave population, where the family is not legally recognized, and, for the same reason, to the settlement of the rights of illegitimates. Where would the negro have been in suits for freedom, after a few years, on a change of domicile by the master, with the presumption of slavery against them by reason of color, if the English rule had been rigidly adhered to? In this state we have departed from it, and allow hearsay from other than members of the family, and public repute in the community. *Flowers* v. *Haralson*, 6 Yerg. 494; *Ewell* v. *State*, 6 Yerg. 364; *Ford* v. *Ford*, 7 Humph. 92. We concede, however, in a conflict of testimony, that hearsay in the family is entitled, other things being equal, to greater consideration. *Saunders* v. *Fuller*, 4 Humph. 516. And we have, to the credit of our judiciary be it said, in the teeth of decisions to the contrary by Chief Justice Marshall and the Supreme Court of the United States, extended the right to introduce hearsay evidence to its utmost limits, *in favorem libertatis*, in suits for freedom. *Vaughan* v. *Phebe*, M. & Y. 5; *Miller* v. *Denman*, 8 Yerg. 236. The case in Martin & Yerger, where this extension was made, was argued with consummate ability, on the one side by James Rucks, afterwards a distinguished judge of this circuit, and on the other by Francis B. Fogg, who has lived to become the head of our bar in age, as he had long been in learning and wisdom.

There can be no doubt, under our decisions, that so much of the testimony in this case, based upon hearsay or reputation, as relates to the pedigree of James M. Garrett is admissible, whether it comes from members of the family or third persons, to be weighed according to the sources of information, the opportunities of witnesses, and the surrounding circumstances.

There is another rule of law, however, which may affect this testimony. Hearsay and reputation are admissible in matters of pedigree, and pedigree includes, doubtless, descent from a particular person, whether white, Indian, or negro, at any rate in suits for freedom. *Walkup* v. *Pratt*, 5 Har. & J. 51, 56; *Vaughan* v. *Phebe*, M. & Y. 5, 19. But is hearsay or reputation competent to prove shade of color or place of death? Upon principle it would seem clearly not. For these particular facts are not pedigree, nor at all essential in tracing genealogy. Accordingly, all the authorities agree that hearsay evidence is not admissible to establish a distinct fact from which you may draw inferences. Reputation and traditionary declarations are admitted, in England, to prove what Lord Eldon, in *Whitelocke* v. *Baker*, 13 Ves. 514, calls the " body " of the tradition—never particular details. *Berkley Peerage Case*, 4 Campb. 415; *Antram* v. *Moorewood*, 5 T. R. 125; *Rex* v. *Erith*, 8 East, 539. And see *Ellicott* v. *Pearl*, 10 Pet. 412, 438. The rule is thus generalized by Marshall, C. J., in the leading case in America of *Mima Queen* v. *Hepburn*, 7 Cranch, 290: "Hearsay evidence is incompetent to establish any specific fact, which fact is in its nature susceptible of being proved by witnesses who speak from their own knowledge." Hearsay is admissible as to relationship, *ex necessitate*, because you cannot prove the connection in any other way. But the place of a man's birth, or residence, or death, or the color of his skin or his eyes, is a specific fact capable of being proved by direct testimony, and about which general reputation would only be misleading. And it cannot alter the rule that, from lapse of time or death of witnesses, the fact cannot actually be proved, for this may occur in relation to any fact upon which the rights of an individual may depend. Accordingly, it was held in *Mima Queen* v. *Hepburn, ut supra*, that it was not allowable to prove by reputation or hearsay, even in a suit for freedom, that a particular person, proved to be the ancestor of the

plaintiff, came or was brought from England, or was born in England, or was free, or was brought to this country by a certain person who offered to sell her. So, in *Davis* v. *Wood*, 1 Wheat. 6, evidence of hearsay and general reputation was admitted to prove the pedigree of the plaintiff, who was suing for his freedom, from one Mary Davis, but not to show that Mary Davis was a white woman, born in England, and the rulings of the case in Cranch were reaffirmed. Our supreme court, in *Vaughan* v. *Phebe*, dissented from these cases so far as they prohibited the proof by hearsay and reputation of a right to freedom, and of the race of the ancestor of the person suing, but conceded, and so did Mr. Fogg, in his able argument for the person suing for freedom, that " you may not introduce any evidence of hearsay or reputation as to a particular fact." M. & Y. 23. And the authorities are uniform that the place of birth cannot be thus proved. *Independence* v. *Pompton*, 4 Halst. 209 ; *Shearer* v. *Clay*, 1 Litt. 260 ; *s. c.*, 3 Marsh. 549 ; *Jackson* v. *Etz*, 5 Cow. 320 ; *Wilmington* v. *Burlington*, 4 Pick. 174.; *Rex* v. *Eriswell*, 3 T. R. 707. I am not aware of any decision in this state in conflict with these rulings.

The hearsay evidence, therefore, as to the color of Sarah's mother, is all inadmissible, and similar evidence as to the place of her death. This would exclude all the evidence of the two witnesses introduced by those who claim under James M. Garrett, and all the evidence of the witnesses introduced by the Matherleys, as to the color of Sarah's mother, except that of the witness who speaks from his own knowledge. The result would be to leave the testimony of that witness, corroborated as it is by the general reputation, as far as it goes, of the other witnesses, and uncontradicted, to carry the day. It must be conceded, then, that the mother of Sarah was a full-blooded negress, or, at any rate—to put it most favorably for those who claim under Garrett—that there is no evidence on the point.

In the latter event, we are driven to ascertain the fact in controversy by the direct testimony of the witnesses who testify from personal knowledge and observation of the extent of the mixture of races in Sarah herself. For, while the fact that she was a half-breed, or more or less than a half-breed, might be shown by testimony touching her ancestors, it may also be shown by testimony touching herself. This evidence consists, in this record, first, of the opinions of witnesses, formed from observation and the exercise of judgment; and, secondly, of descriptions of the personal appearance of Sarah, from which the court can form its own opinion. Not a single witness, I believe, undertakes to express an opinion that Sarah is more than half white, while several of them, including one witness introduced by those claiming under Garrett, unhesitatingly say she was, in their opinion, a half-breed. Five witnesses describe her as a dark-skinned mulatto, with kinky hair, flat nose, and thick lips. None of the other witnesses say anything of the nose or lips, and only one, Paralee, says her hair was not kinky. The witness of Garrett who expresses the opinion that she was a half-breed, but admits he never saw her except at her grandson's wedding, when she was doubtless dressed up for the occasion, says "her complexion was that of a medium bright mulatto." Paralee says she was a "bright mulatto," and Paralee's paramour, Montgomery, says she was "nearly white—as light complexioned as most any one." Excluding the latter as utterly unworthy of credit, or including it for what it may be worth, the evidence is entirely conclusive that Sarah was a half-breed.

My opinion, from the direct testimony, is that Sarah was only one remove from the negro. I am of the same opinion from the hearsay evidence, whether it be restricted within the limits above described, or be all admitted as competent I am clearly of opinion that James M. Garrett is in the third degree of mixed blood, and that the marriage between him and Myra was void.

The Matherleys are, therefore, entitled to the property in controversy. The costs will be paid out of the funds in court, if any, or by them.