JACKSON, *ex dem.* THE PEOPLE, *against* ETZ and others.

EJECTMENT for 450 acres of lot No. 77, Tully, (now Preble) Cortland county, tried at the Cortland circuit, September, 1824, before ROCHESTER, C. Judge.

At the trial, the Attorney General produced a patent to one John Tool, for 500 acres in lot 77, in Tully, dated 13th September, 1790, which passed the secretary's office, August 29th, 1791. He then produced the office copy of the balloting book, which among the returns of dead of the different regiments, was thus: "John Tool, of the 4th regiment, Fowler's company, died 26th March 1779."

In ejectment by the people, for escheated lands *propter defectum sanguinis,* the jury should be satisfied beyond all reasonable doubt, that the tenant whose lands are claimed as being escheated, died without heirs.

Hearsay evidence of finding the body and burial of one supposed to be dead, is inadmissible; though otherwise as to the fact of his death.

That one was missing at a particular time, with a report and general belief of his death, is, *it seems, prima facie* evidence of his death.

Evidence is inadmissible to support the testimony of a witness by showing the consistency between his former declarations and his evidence on the trial, unless he is first impeached.

The rule is, that a witness cannot be supported by evidence in chief; but if he is impeached it may be heard in reply.

In ejectment for escheated land, proof that a man's intimate acquaintances for several years never heard him speak of his family, father, mother, wife or children, is *prima facie,* evidence that he has no heirs, if the place of his birth be unknown to them, and there appear no clue to better evidence; but this may be overthrown by very slight proof of heirs.

That one is reputed to be an Irishman, and has the accent, or brogue of an Irishman, and is reported to be an Irish deserter, is, *prima facie,* evidence that he is an Irishman.

A grant of land to an alien soldier for military services during the revolutionary war, and who died during that war, enables his heirs, though aliens, to inherit.

So of a slave. His heirs, though born of a wife who was a slave, may inherit under such a grant. Per Sutherland, J. upon the authority of *Jackson v. Hervey,* not reported.

'The Attorney General then proceeded by various witnesses to identify this John Tool, the patentee thus described in the balloting book; contending that he was an Irishman, a foreigner by birth, and that he died without heirs, whereby the premises in question escheated to the state.

The defendant sought to show by various witnesses, that Tool's being returned dead was a mistake; that in truth he had deserted from the American service, and lived several years after the American war, having a wife and children; but it was agreed by both parties that he was an Irishman, who deserted from the British service, during the revolutionary war, and enlisted into the American army, and that the patent in question was granted in consideration of his enlistment and military services; according to the law of this state.

In the course of the trial, several questions arose and were decided by the judge, which, with the facts, are sufficiently noticed in the opinion of the court.

Verdict for the plaintiff.

*E. Williams*, for the defendant, moved for a new trial.

*Talcott*, Attorney General, contra.

*Curia*, per SUTHERLAND, J.   The right of the state to recover the premises in question, depends upon the fact, whether John Tool, the soldier to whom they were patented died without heirs capable of inheriting his estate.

If he left no heirs, it is immaterial whether he was a foreigner, or an American citizen.   His land would escheat *propter defectum sanguinis.*

If he was an alien himself, and left only alien heirs, the question arises, whether this case, from the nature and circumstances of the grant, forms an exception to the general rule, that aliens are incapable of taking by descent.

Although the patentee was a foreigner, if he left natural born descendants, they would be entitled to take by inheritance, and the escheat would be defeated.

The judge correctly charged the jury, that, unless they were satisfied beyond a reasonable doubt, that John Tool

died witnout heirs, they must find for the defendant. They notwithstanding, found for the plaintiff; and their verdict appears to me to be clearly against the weight of evidence.

There is no evidence of the existence of more than one John Tool. The John Tool spoken of by the defendants' witnesses, corresponds in age, in personal appearance, in his dialect, habits and manners, with the soldier of that name described by the witnesses for the plaintiff. They were both between twenty-five and thirty years of age, of about the same height, of light florid complexion, sandy hair and whiskers. Both spoke with a strong Irish accent, and appeared to be Irishmen by birth. They were both remarkably jovial and noisy; sociable and fond of liquor, but not drunkards. Both were great talkers; and both were said to be Irish deserters. The John Tool, spoken of by the defendants' witnesses, enlisted at Noble-Town, in the winter of 1776; and the plaintiff's witnesses first saw there John Tool in the barracks at Fishkill, in the winter or spring of that year. All the plaintiff's witnesses agree, that they never knew but one John Tool; and he belonged to Fowler's company, and was stationed, in the winter of 1779, at Fort Plank, on the Mohawk River, where they all saw and knew him. Col. McKinstry knew the John Tool of whom the defendants' witnesses speak, at Noble-Town, before he enlisted; and the individual whom he there knew, and who was there enlisted, he afterwards saw at Fort Plank, in the uniform of a soldier. He told him he belonged to the army, and wished Col. McKinstry to aid him in obtaining a furlough.

The identity of these individuals, I consider therefore established, with all the certainty which human testimony, both direct and circumstantial, is capable of affording. Did this John Tool die at Fort Plank in the spring of 1779 ? The story of the plaintiff's witnesses, that Tool was lost or missing in returning from Diffendorf's tavern to the camp, on the night of St. Patrick's; and that it was afterwards generally reported and believed that he was dead, is perfectly consistent with the evidence on the part of the defendants. Both parties admit that he left his companions on the night of St. Patrick's 1779, and was not afterwards seen alive in

camp. The plaintiff alleges that he died on that night; and the defendant that he deserted and returned to his family at Noble-Town.

Three witnesses on the part of the defendant, Pixley, White and Col. M'Kinstry, swear that they were well acquainted with Tool before he enlisted. That in the spring of 1779 he returned to Noble-Town, where his family, as well as the witnesses, resided. That he admitted his desertion on the night of St. Patrick's; and related particularly the manner and circumstances, together with his motives for leaving the army. His story, as related by them, corresponds in every particular with the account given by the plaintiff's witnesses, up to the time of his separation from his companions in returning to camp. He feigned himself drunk, and let his comrades go ahead; and then made the best of his way home. Nathan Rowley, another witness, has often heard him tell the story of his desertion. There is nothing improbable or unnatural in this relation; and the considerations, which the witnesses state prevented the neighbours of Tool from taking him up as a deserter, are such as were calculated to have that effect.

These witnesses cannot be mistaken in the material facts to which they have sworn. The story told by Tool, puts the fact of his identity beyond the possibility of question. We must believe, that he returned to Noble-Town, and gave the account of himself to which they have testified; or that four witnesses have wilfully and deliberately perjured themselves. I do not see that human charity can find any escape from this conclusion.

I have already remarked, thet so far as the general reputation and belief of Tool's death at Fort Plank is concerned, it is not inconsistent with the narration given by the defendant's witnesses. Having been a faithful soldier, as Capt. Fowler says, they did not suspect him of desertion; but supposed he had either perished in a severe snow storm, or been destroyed by the savages. He was of course returned dead; and he always said they would think he was dead.

What, then, are the facts and circumstances proved on the part of the plaintiff, independent of general reputation, which tend to establish the fact of his having died at Fort Plank ?

Several witnesses testify, that eight or ten days afte Tool was stated to have perished, it was said, or reported that his body was found. But Johnson, Sanford, and Sparks, are the only witnesses who pretend to have seen, and recognised his body. They, however, swear, that eight or ten days after tool was missing, news came to the Fort that a soldier was found dead. That they went tc see the body and found it was Tool. That a grave was dug, and he was buried on the spot where he was found. These witnesses undoubtedly believe what they have sworn to. The testimony of Johnson, however, is subject to the remark, that by his own admission his memory is nearly gone ; that he recollects no other fact or circumstance, which occurred at that period. He could name no other soldier who died during the war ; and he recollected the name of only one who belonged to his regiment. He was 74 years of age : and from the general character of his testimony, appears to have been a superanuated and imbecile old man : and if he was unsupported by other witnesses, I should think his testimony, from the considerations which I have stated, entitled to very little weight. But he is corroborated by Sandford and Sparks ; and to the character of their testimony there appears to be no just exception. Capt. Fowler, however, swears that he never heard that Tool was seen dead or alive after he was first missing ; and Ensign Morell never heard that he was found.

Now, under the circumstances of this case, which of these witnesses are most likely to be mistaken ? Those who swear to having seen the dead body of Tool ; or those who testify that they saw him in life and health, long after the period when he was said to have died ; and heard from his own lips the account of his escape ; corresponding in every particular with the facts proved in the case up to the 17th of March, 1779, when he was supposed to have perished ?

The plaintiff's witnesses must be mistaken. The body which they saw must have been that of some other soldier.

ALBANY,
Fob. 1826.

Jackson
v.
Etz.

The change which death produces in the human counte-nance is such as to render mistake natural and probable. Those who supposed it to be the body of Tool, believed that it had been exposed for ten aays. The general belief that Tool was frozen to death on the night of St. Patrick's, followed by the finding of a dead body within a few days after, would naturally give rise to the report that Tool's body was found; and all who came to see it would come with the previous impression that it was Tool. And unless there had appeared some striking dissimilarity in the size or prominent features, such impression would not be likely to be removed. The more minute characteristics of Tool would not be expected to be found, after an exposure for such a length of time.

The verdict, therefore, is, in my judgment, decidedly against the weight of evidence. For if Tool, the patentee, did not die at Fort Plank, but escaped and returned to No-ble Town, then it was most clearly proved that he was married, and had several children born in this state, some of whom were living at the time of the trial. The plaintiff, therefore, could not recover on the ground of an escheat.

The hearsay evidence of the finding of the body, and the burial of Tool, was improperly admitted. Proof of the gen-eral report, and belief of his death, on the night of St. Pat-rick's, was not objected to, and seems, from analogy to cases of pedigree, &c. to be admissible. The fact that a soldier, or any other individual, was missing at a particular time, accompanied with a report and general belief of his death, must be, in many cases, not only the best, but the only evi-dence which can be supposed to exist of his death. It is, perhaps, reasonable that it should be held, *prima facie*, suf-ficient. (*Doe* v. *Griffin*, 15 East, 293.) But a report that the body of a particular individual was found, and buried at a particular time and place, carries on the face of it an ad-mission, that, if it is well founded, it is not the best evidence which exists in the case; for the body must have been found and buried by human agents, who are presumed to be com-petent and capable of testifying to the facts, especially if they did not occur at a very remote period. Particular and insulated facts cannot be proved by hearsay or general rep-

·utation. The evidence of them is not to be supposed to exist only in general reputation, and hearsay; as it is in cases of pedigree, prescription and custom. Although a pedigree may be proved by hearsay, the place of birth cannot. (*Rex* v. *Erith*, 8 East, 542. 15 East, 293-4, note. *Bartlet* v. *Delprat*, 4 Mass. Rep. 702. Bull N. P. 294. 1 Phil. Ev. 180. *Jackson* v. *Boneham*, 15 John. 226. 18 John. 39. *Berkley Peerage case*, 4 Campb. 415, per Mansfield, Ch. Justice.)

In this case, the hearsay testimony of Reeve is of the loosest character. He says, when he was sick, "news came that Tool was missing; and after 8 or 10 days, it was said Tool was found. That several soldiers went to the funeral, and when they returned, it was reported that Tool was found and buried. It does not amount to a general report; nor does it appear who said or reported that he was found and buried; nor of course, whether those by whom it was said or reported had the means of knowing the fact. What effect this testimony had with the jury, it is impossible to say. It was calculated to corroborate the direct testimony of the finding and burial of Tool; and in that way undoubtedly had its weight.

The evidence offered to support the testimony of Col. M'Kinstry, by showing what he had before said, to be consistent with his testimony, was properly rejected. There was no attempt to impeach his general character; or to show that he had been inconsistent with himself in giving different accounts of the transactions to which he testified. I know of no exception to the rule that a witness cannot be supported by evidence in chief. If impeached, it is admissible in reply. (1 Phil. Ev. 212, 13, N. Y. ed. 1816. Bull. N. P. 294.)

I am inclined to think that the proof was, *prima facie*, sufficient to show that Tool died without heirs, if the evidence on the part of the defendant is to be excluded from the case on the ground that it relates to a different person, or is unworthy of credit. He was never heard to speak of his family, father, mother, wife or children. What better evidence, then, does the nature of the case admit? Of whom are enquiries to be made? The place of his birth is not known,

Most of the witnesses think he was an Irishman; but he never spoke of the place of his nativity; nor does there appear to be any clue by evidence of a higher or more satisfactory character.

Very slight proof, I admit, on the part of the defendant, that the patentee had relatives or connexions, would counterbalance this negative evidence. But in the absence of any such proof, I think the evidence on the part of the plaintiff may be considered, *prima facie*, sufficient. The witnesses were not transient acquaintances of Tool. Some of them were his fellow soldiers and companions for more than two years.

I am also of opinion that there was sufficient evidence, *prima facie*, that Tool was a foreigner. Every witness in the cause testifies that he was reputed and believed to be an Irishman; had the appearance and dialect of an Irishman; some say he was reputed to be an Irish deserter.

But admitting that he left alien heirs, could they inherit the premises in question? It is contended that the patent and laws of this state vested the title in the heirs of John Tool; and conferred upon them, whether natives or aliens, the capacity to hold. I consider this to be the doctrine of the Court of Errors in *Goodell* v. *Jackson*, (20 John. 703.) That was the case of a patent granted to an Indian soldier, who served during the revolutionary war. And the principal question was, whether the son of the patentee, being an Oneida Indian, was competent to take and hold as heir, the lands thus granted to his father.

The Supreme Court held, that the Oneida Indians were to be considered as citizens of this state; and not a distinct and independent people. That the son of the soldier was therefore entitled to take and hold by descent as a citizen; and was not subject to the disabilities of alienism. The court of Errors, however, in the opinion delivered by Chancellor Kent, maintained that the Oneida Indians did not form an integral part of the people of this state; but that they were a distinct community, possessing, and recognized both by this state and the United States, as possessing many, if not all the attributes of a distinct and independent, though depressed and degraded people. The Chancellor says,

ALBANY,
Feb. 1826.

. Jackson
v.
Etz.

"if, therefore, the case turned upon the question, whether William, the Indian heir, was a citizen or an alien in 1783, I should not be in favor of the conclusion drawn by the Supreme Court. But I do not place the cause upon that ground, for the reasons which have already been mentioned. I take it, (he continues) as a given point, that the patent issued according to the direction, and under the authority of the statute mentioned in it; and then, I say, that the grant to John Sagoharase and his heirs, rendered the Indian heir competent to take, though an alien; and his title was not liable to be impeached on account of his civil or political condition."

In the case of *Jackson* v. *Hervey*, (lately decided by this court) the patent issued to Peter Slingerland, a slave, who was a soldier in the revolutionary army, and died during the war, leaving a child born of a woman also a slave. From this child, the defendant was a *bona fide* purchaser; and it was held that the patent, taken in connexion with the laws under which it issued, was to be considered as a legislative grant, conferring upon the soldier, though an alien or a slave, the capacity to take and transmit the land to his heirs. The court say, "can it be supposed that the party thus granting, in express terms, to the soldier and his heirs, intended to raise the question of disability, arising from alienism or slavery? The soldier being dead, when the patent issued, it was, in effect, a grant to his heirs. What heirs were intended? Evidently, the persons who stood in such relation to him, as would entitle them to inherit, provided the soldier had been a freeman and a citizen." Upon the authority of these cases, therefore, without repeating the arguments and considerations upon which the decisions were founded, I consider it a matter of indifference, if the patentee left heirs, whether they were aliens or native American citizens.

New trial granted.