The State v. Grant.

THE STATE v. GRANT, *Appellant.*

1. **Witness Disqualified by Conviction**: LEGISLATURE CANNOT RESTORE COMPETENCY: RETROSPECTIVE LEGISLATION. Prior to the Revised Statutes of 1879, a person convicted of petit larceny, was under section 66 of chapter 201 of General Statutes 1865, incompetent to be sworn as a witness in any cause, and the omission of the disqualifying clause in the Revision of 1879 was not designed to remove, and did not remove such incompetency occurring anterior to the time the latter statutes took effect. It is a settled rule in the construction of statutes in this State, that they are to operate prospectively and not otherwise, unless the intent that they are to operate retrospectively, is manifested on the face of the statute, in a manner altogether free from ambiguity. Besides, incompetency to testify is one of the incidents of a conviction of crime, and part of the punishment, if not of the judgment, and the legislature cannot, without trenching on the pardoning power vested exclusively in the executive, attempt to do away with it.

2. **Impeaching Witness**: CONTRADICTORY STATEMENT. A statement of a witness, contradictory of his testimony, is not admissible in evidence, unless his attention has been properly called to such statement; and this is the rule as to written as well as oral statements— and the rigor of the rule is not relaxed even where it is impossible to comply with it.

3. **Character of Witness.** A witness may be impeached, not only by general reputation as to veracity, but the inquiry may extend to the general moral character or reputation of the witness, and anything showing deterioration of that general moral character or reputation, is admissible, such as, that the general reputation of the witness was that of a common drunkard, and that a female witness has

8—79

a general reputation for unchastity, and that such reputation extends to miscegenous prostitution ; but evidence as to a specific act is inadmissible.

4. **Support of Witness.** Evidence of prior consistent statements of a witness are competent after, but not before an attempt to impeach him.

5. **Power to Arrest.** A policeman is not authorized to attempt an arrest on mere belief that a party has been guilty of an offense or is then engaged in the commission of one, if such belief has no basis of fact or circumstance on which to rest.

6. **Instructions.** On re-trial the lower court is directed to substitute the words 'reasonable suspicion" or "probable suspicion," for the word "believed," in an instruction formerly approved.

7. **Evidence of Other Offense.** An officer suspected a person of theft of goods in his possession : the officer thereupon attempted an arrest of such person, and was slain by such person to prevent the arrest; *Held*, that on a trial of one accused of such homicide, the State was properly allowed to prove that the goods in the possession of the slayer had in fact been stolen shortly preceding the homicide, although such theft was not discovered until the next day after the homicide. It is a matter of common experience that those who engage in crime, especially in that of theft, while yet in the possession of the fruits of the crime and while engaged in carrying away the things stolen, act in a manner altogether different from those engaged in honest pursuits. The evidence of the larceny was, therefore, admissible on the ground of furnishing "indications" to the officer by the manner and demeanor of the criminal possessed of the fruits of the crime. It was also admissible as showing a motive for escape from arrest and punishment on the part of him who first committed the larceny and afterward the homicide. HENRY, J., dissented from this proposition.

8. **Threats.** On a trial for the homicide of a policeman, it is competent for the State to show that anterior to the homicide the accused made threats "against policemen" generally ; and this, whether the threats were recent or remote.

9. **Depositions.** The trial court refused instructions to the effect that depositions are entitled to the same weight and credence as oral testimony. *Held*, no error.

*Appeal from Jackson Criminal Court.*—Trial before HON. NOAH M. GIVAN, Judge of the Seventh Judicial Circuit.

REVERSED

This was an appeal from a conviction of murder in the

first degree for the killing of one Patrick Jones, a police-man of Kansas City. [The record showed substantially the following facts, viz: That at just about dark, on the even-ing of April 3rd, 1882, Jones was returning home from day duty as policeman, and was about to enter his gate, fronting on St. Louis avenue, in said city, when one George Miller hailed him in a friendly way, and deceased thereupon stood with Miller, on the sidewalk, and they there engaged in conversation for a few moments about the killing of Jesse James, which had occurred that day. While engaged in this conversation, two negro men, each having a bucket of butter, passed along by deceased and Miller, on the side-walk, going westwardly. Deceased noticed them as they passed, and winked at Miller, and Miller responded, "stolen butter." When the men with the butter had proceeded only a few feet, the deceased started after them. The deceased pursued them but a short distance when he was slain by one of them shooting him with a pistol. The State offered evi-dence tending to prove that defendant was one of the two men bearing the butter. Defendant's evidence tended to prove the contrary.

Miller being offered as a witness on the part of the State, was objected to because he had been convicted at the February term, 1878, of the criminal court of Jackson county, of petit larceny. The objection was overruled and Miller was allowed to testify.

Etchingham, another witness for the State, against the objection of defendant, was allowed to testify that about two years before the homicide defendant had said he "would kill any damn son-of-a-bitch of a policeman who tried to arrest him again."

Against the objection of defendant, the State was al-lowed to show that the butter in the possession of the two men had just been stolen from the office of Adams Express Company. It was conceded that Jones had not heard of the theft when he attempted the arrest

Defendant read in evidence the deposition of Martha

Canfield, who testified that she saw the whole of the diffi-
culty that resulted in the killing of Jones, and that his
slayer and the man with him were both mulattoes and not
black, like defendant; that she was about twenty feet from
Jones and about twenty-five feet from his slayer when the
fatal shot was fired. By way of impeaching this witness,
the State offered and was allowed to read in evidence an
affidavit given by her before her deposition was taken, and
filed by the defendant after a former trial of this case, in
which she stated that she was near enough to the parties to
have placed her hand upon them during the difficulty.
This affidavit was not shown to the witness when she gave
her deposition; nor was she asked to explain the discrep-
ancy between her statements. The State was also allowed
to show that this witness had been arrested for drunken-
ness, that she had the reputation of being an unchaste
woman, and that this reputation applied to blacks and
whites alike. In rebuttal of this testimony the defendant
was allowed to show by several witnesses that before her
deposition was taken the witness made statements to them
consistent with the deposition.

*W. A. Harnsberger* and *R. H. Field* for appellant.

*D. H. McIntyre,* Attorney General, for the State.

SHERWOOD, J.—This cause has come again to this court
on appeal. When it was here on a former occasion the
judgment was reversed because of the error committed in
failing to instruct the jury in reference to the knowledge
of the defendant of the official character of the deceased.
*State v. Grant,* 76 Mo. 236. Since then there have been
two juries empanelled in the cause, the first failing to agree,
and the second returning a verdict of murder in the first
degree, as was done by the jury on the first trial; hence
this appeal in which we are not only called upon to review
fresh errors, which it is alleged occurred at the recent trial,

but also asked to reconsider some of the rulings made when the cause was here before.

## I.

The first point to which attention will be directed is, whether error was committed in admitting, over the objection of the defendant, the witness Miller, to testify on the part of the State. Miller, in February, 1878, had been convicted of petit larceny, and the record of such conviction was produced by the defendant upon making such objection. In order to determine the point thus presented, it will be necessary to determine the meaning, force and effect of certain statutory changes which were made by the Revised Statutes of 1879, i. e., whether the legislature intended them to apply to antecedent convictions, and if so, whether it was in the power of the legislature thus to apply them. As the law stood at the time of Miller's conviction, the General Statutes were then in force, section 66, chapter 201, providing that " Every person who shall be convicted of arson, burglary, robbery or larceny, in any degree in this chapter specified, or who shall be sentenced to imprisonment in the penitentiary for any other crime punishable under the provisions of this chapter, shall be incompetent to be sworn as a witness or serve as a juror in any cause, and shall be forever disqualified from voting at any election, or holding any office of honor, trust or profit, within this State." In the revision of 1879 the words " to be sworn as a witness," were omitted. § 1378. Similar statutory changes also occur in the present revision. §§ 1416, 1467. Do these omissions, these changes in the law, apply retrospectively? Were they intended to apply in that way?

If there is any rule for the construction of statutes well settled in this State, it is this: That they are to operate prospectively, and not otherwise, unless the intent that they are to operate in such an unusual way, to-wit: retrospectively, is manifested on the face of the statute in a manner altogether free from ambiguity. *State ex rel. v.*

*Auditor*, 41 Mo. 25 ; *State ex rel. v. Ferguson*, 62 Mo. 77 ; *Thompson v. Smith*, 8 Mo. 723 ; *State ex rel. v. Hays*, 52 Mo. 578. In the case last cited the rule, is announced by Ewing, J., in words still more emphatic. He says : "Statutes are not to be construed as having a retrospective effect, unless the intention of the legislature is clearly expressed that they shall so operate, and unless the language employed admits of no other construction." The same rule is stated by Mr. Sedgwick : "Courts refuse to give statutes retroactive construction unless the intention is so clear and positive as by no possibility to admit of any other construction." Construction of Stat.: Const. Law, 166, *et seq.*, and cases cited.

Abundant authority elsewhere supports the position here taken. In Wisconsin, when speaking of the intention of the legislature, the supreme court of that state says : "There is language used in the law of 1865, which, in its broad general sense might, perhaps, be held to apply to tax deeds of municipal corporations previously executed. It declares that the grantee named in any deed made by the treasurer of any incorporated city or village, on the sale of lands for the non-payment of taxes, may at any time within three years after the date of such conveyance commence an action, etc." "This language, however, must be construed as applying to deeds executed after the passage of the law. For the rule is well settled that statutes are not to be construed as having a retrospective effect unless the intention of the legislature is clearly expressed that they shall so operate. *Seamans v. Carter*, 15 Wis. 548. That intention is not to be assumed from the mere fact that general language is used which might include past transactions as well as future. Statutes are frequently drawn in such a manner, yet such general language is held to have been used in view of the established rule that statutes are construed as relating to future transactions and not to past." This is the language of Mr. Justice Paine in the above case ; and there can be no doubt that it is fully in harmony with the author-

ities on this subject. *Finney v. Ackerman*, 21 Wis. 271, and cases cited; *Ely v. Holton*, 15 N. Y. 595, and cases cited. In the cases just mentioned the principle under discussion was applied even in remedial statutes. Mr. Justice Cooley announces the same rule as applicable alike to constitutions and to statutes, saying: "It is one of such obvious convenience and justice that it must always be adhered to in the construction of statutes, unless there is something on the face of the enactment putting it beyond doubt that the legislature meant it to operate retrospectively, * * Retrospective legislation is * * commonly objectionable in principle and apt to result in injustice; and it is a sound rule of construction which refuses lightly to imply an intent to enact it." Cooley Const. Lim., 76.

These authorities have been cited and quoted thus at large, not because of any doubt entertained on the subject, but because it is contended on behalf of the State that in consequence of the omitted words, "to be sworn as a witness," as appears in section 1378, *supra*, the disqualification imposed on the witness Miller, as a consequence of his conviction in 1878, was removed, and he was competent in that capacity. There is nothing in the section referred to which indicates in the remotest degree that the legislature intended it should operate on past transactions, or was designed as a means whereby the competency of a witness lost, by reason of a conviction occurring anterior to the time the statute took effect, should be restored in consequence merely of the omission of the disqualifying words. Applying then the principle heretofore announced to the case at bar, it should be held that the amendatory section is applicable, and was only intended to be applicable to cases arising in the future and not to past transactions. Construing the section in question in this way, construing it as applying to convictions which occurred after the laws of 1879 went into effect, no difficulties will beset the pathway of adjudication—difficulties which otherwise will arise, as will be presently pointed out, of no small proportions.

At the same revising session section 8, page 844 of the General Statutes, was so amended as to admit of one convict, confined in the penitentiary, testifying on behalf of the State against any fellow-convict for "any offense actually committed whilst in prison and whilst the witness shall have been confined in the penitentiary." R. S. 1879, § 1848. If the effect of the bare omission of certain disqualifying words was to restore to competency convicts who had been theretofore convicted, no necessity could have arisen to have made a convict competent as a witness, in a particular class of cases partially competent, when by the force and effect of other statutory provisions he was as a witness universally competent, and it is not to be supposed that the legislature would go through the barren solemnity of enacting a nugatory amendment. So far as changes have been made in the two sections referred to, such changes should be regarded as new and independent enactments and applicable alone to such cases as arise in the future, whether the change consists in additions or omissions. This view finds support in *Ely v. Holton, supra,* and *People v. Carnal,* 2 Selden 433, and harmonizes with sections 3160 and 3161, Revised Statutes.

In addition, as showing that the legislature did not intend to legislate as to past transactions, it may be said that sections 1675 and 3151 making provisions in substance that the status of a criminal as to punishment, fines, penalties and forfeitures incurred prior to the repealing of a statute, should not be affected by such repeal, remain unchanged. These sections being in *pari materia,* relating to the punishment of crimes, re-enacted at the same revising session as part of the former law, tend, it would seem, very strongly to show that the legislative mind intended to enact nothing and did enact nothing at war with the sections just mentioned.

But there are reasons, and very cogent ones, it would seem, which may be urged to show that, even had the legislature intended that the omission of the words "to testify

as a witness" should relate to antecedent convictions, should upon those convictions, lop off a portion of a judgment of a court of competent jurisdiction, and restore to competency one whom the law beforehand, and the judgment of a court subsequently had branded as infamous—that this was something altogether beyond the pale of legislative power.    After judgment has been passed upon an offender, there are but two ways whereby he can be relieved from the results flowing from that judicial act; first, by a reversal of the judgment, and second, by a pardon.    1 Greenleaf Ev., § 377, and cases cited.    But it is said that " a distinction hath been taken where the incompetence is the general constructive result by presumption of law on conviction on an infamizing charge, and where it is expressly included in the legislative sanction as a consequence annexed to the particular offense, and that inseparably, until the judgment be reversed."    Therefore, the law is now held to be that on perjury at common law the party pardoned may be a witness, because the king has power to take off every part of the penalty.    *    *    But if a man be indicted for perjury on the statute the king cannot pardon so as to discharge this incompetency, for the king is excluded and divested of that prerogative by the express words of the statute :    " The oath of such person so offending not to be received in any court of record," or as the statute elsewhere expressed it, " the offender from thenceforth to be discredited and disabled forever to be sworn in any of the courts of record."    1 Gilb. Ev., 260 ; 1 Greenleaf Ev., §§ 377, 378 ; 1 Chitty Crim. Law, 602, 776 ; 7 Bac. Abr., 417 ; 3 Bac. Abr., 487.    But a party thus convicted might have been restored by a statute pardon, (*Rex v. Ford*, 2 Salk. 690,) and the authorities cited state that the reason of the difference between the two kinds of pardon is this : That in a pardon based on a prosecution based on the common law the loss of certain civil rights only flows from the conviction as a consequence of the judgment; while in a conviction based on a statute which annexes certain disa-

bilities to the conviction of the crime by express words, the disabilities under the sanction of the law become part of the judgment. *Rex v. Ford, supra,* and cases cited; *Rex v. Griepe,* 1 Lord Ray! 256; 3 Bac. Abr., 487, and cases cited. The disability which the statute of Fifth Elizabeth annexes to the commission of the crime of perjury was construed to be a part of the punishment, and where conviction followed prosecution the disability was held to be part of the judgment. And it does not appear to have been necessary that the provision of the statute touching the disability should have been formally entered on the record, in order that it constitute a part of the judgment. 2 Hargrave's Jurid. Arguments, 221. According to the author just cited, where the power of the king to pardon is discussed with distinguished clearness and ability, it may well be doubted whether the distinction taken in the authorities previously cited, between a pardon based on a common law conviction and one based on a statutory conviction, is well taken. But there appears to be no difference of opinion as to the view that where the statute annexes certain disabilities to the commission of a crime that upon conviction of the crime those disabilities form part and parcel of the judgment, and it would seem at first blush that this must be so. *Ex. Gr.* It is a familiar rule that whatever the law implies will be as much part of a contract as if expressly inserted therein; and as to judgments in civil cases the same rule prevails. A judgment for the recovery of money will bear six per cent interest, though no such statement be made in the judgment entry. A judgment lien will last for three years, though in the judgment itself no such statement be entered, and a judgment will be valid and binding for ten years though the record entry of the judgment be silent on the point. From these premises the conclusion may rationally be drawn that under the statutory provisions now being discussed the disabilities which that statute annexes to the commission of a certain offense form, where conviction follows prosecution, part and parcel of the conviction.

And if such disabilities do not form, in contemplation of law, part of the judgment of conviction—part of the punishment annexed to the crime—then the record of the judgment of conviction would afford no evidence that the disabilities denounced by the statute had been incurred. The statute of Fifth Elizabeth does not require, no more than does section 1378, that the disabilities specified should in *haec verba* form part of the judgment of conviction.

Now, the question arises, if section 1378 is to have a retroactive effect, whether it does not exceed the power of the legislature. Under the present constitution "powers of government are divided into three distinct departments —the legislative, executive and judicial—each of which shall be confided to a separate magistracy; and no person, or collection of persons, charged with the exercise of powers properly belonging to one of those departments, shall exercise any power properly belonging to either of the others, except in the instances in this constitution expressly directed or permitted." Art. 3.

If the conclusion be the correct one that the disabilities annexed to a conviction of the crime of petit larceny form part of the punishment, and of consequence part of the judgment, then it would seem to follow as an obvious and necessary sequence that any act of the legislature professedly remitting a portion of the judgment, professedly relieving the convict of one of the disabilities incurred, cannot prevail, if the constitution, which forbids one department of the government from the exercise of any power properly belonging to either of the others, is to be obeyed. To push the point at once to its logical extreme, suppose that the legislature had also omitted from section 1378 the words, "to serve as a juror in any cause and shall be forever disqualified from voting at any election, or holding any office of honor, trust or profit, within this State," would any one possess sufficient temerity to contend that such omissions would restore every convict theretofore convicted to his former civil status, rehabilitate him with his former rights of citizenship, and resurrect him from his civil

grave? If the legislature could accomplish such an end by such means, then it would be competent for that body to pass a general law proclaiming in terms that every convict theretofore convicted should be restored to all the civil rights, capacities and privileges lost by reason of his conviction; and such a law would be valid and accomplish the design expressed on its face. For what the legislature may do indirectly, that may they directly. But such an enactment, in my opinion, would be clearly trenching upon the power of the governor and be a usurpation by the legislature of the pardoning power; for if the legislature can remit any portion of the sentence or judgment of a court of competent jurisdiction, then there is no obstacle to their remission of the whole sentence. The difference is only in degree and not in kind. I take it that when the statutes annex certain disabilities, the loss of certain civil rights, to the conviction of a crime, and a conviction of that crime thereafter occurs, that thereupon by force and operation of the law and of the judgment of conviction the disabilities become welded to the crime, forming thereby an indivisible integer incapable of separation by any exertion of legislative power. And this is especially true under a constitution such as ours. The position here taken is plainly this: That the pardoning power is vested by our constitution alone in the governor; that aside from the reversal of the judgment in a criminal cause, the only method of relief from the disabilities annexed to such judgment is by a full pardon of the offense, and that, while the crime itself remains unpardoned, the disabilities annexed thereto will remain unaltered and unaffected by any legislative act. I will cite some cases illustrating this position:

In Pennsylvania, which possesses, so far as concerns the point in hand, a constitution substantially identical with our own, the legislature in 1861 passed an act providing for a graduated deduction from the term of sentence of every prisoner in the penitentiary who should have no infraction of the rules recorded against him. Two convicts made ap-

plication by *habeas corpus* for their discharge under the provisions of that act, whereupon the supreme court said : "A majority of us think the act is unconstitutional as interfering with the judgment of the judiciary. The whole judicial power of the commonwealth is vested in courts. Not a fragment of it belongs to the legislature. The trial, conviction and sentencing of criminals are judicial duties, and the duration or period of the sentence is an essential part of a judicial judgment in a criminal record. Can it be reversed or modified by a board of prison inspectors ? If it can, what judicial decree is not exposed to legislative modification ? From what judicial sentence may not the legislature direct deductions to be made if this act be constitutional? What they may do indirectly they may do directly. If they may authorize boards of inspectors to disregard judicial sentences, why may they not repeal them as fast as they are pronounced, and thus assume the highest judicial functions ? It is to be observed that these questions have reference to the power of the legislature to prescribe a general rule of law that shall be inconsistent with a previous judicial decree. Such a rule, when it operates on future cases, and not retrospectively, is quite legitimate; their power to legislate in that manner is not to be doubted. But under the act in question, the good conduct of a particular individual, under judicial sentence, is to work out for him an abatement of part of his sentence. In respect to one of the relators, who was convicted and sentenced before the law was passed, it is considered very clear that it is a legislative impairing of an existing legal judgment. *    * Any interference with that sentence, except by a court of superior jurisdiction, or by the executive power of a pardon, would seem to be a prostration of that distribution of governmental functions which the constitution makes among co-ordinate departments. In this view the act would be highly unconstitutional." *Comm. ex rel. v. Halloway,* 42 Pa. St. 446.

In Massachusetts this case occurred : McKenzie was

sentenced to the state prison for forgery; subsequently the governor granted him a pardon, whereby, as set forth in the charter, the governor "remitted to McKenzie the residue of the punishment" he was sentenced to endure in the state prison. Thereafter McKenzie's deposition being offered it was objected to on the ground that the competency of McKenzie was not restored by said "charter of pardon," whereupon Morton, J., after remarking upon the limited character of the pardon, said: "It is only a full pardon of the offense which can wipe away the infamy of the conviction and restore the convict to his civil rights.     *     *

We think the view taken by a former distinguished law officer of this commonwealth, whose long experience in the administration of criminal law gave to his opinions the weight of authorities, are correct and sound. He says: 'There is but one mode now in use of restoring the competency of a witness, and that is by pardon under the great seal of the state, which, when fully exercised, is an effectual mode of restoring the competency of a witness. It must be fully exercised to produce this effect, for if the punishment only be pardoned or remitted it will not restore the competency and does not remove the blemish of character. There must be a full and free pardon of the offense before these can be restored and removed.'" *Perkins v. Stevens*, 24 Pick. 277.

In California also a similar point was discussed. A paper in the nature of a pardon was issued with the usual formalities to one Davis, which, after the usual recitals, but without pardoning the offenses, proceeded to " restore said Davis to all rights of citizenship possessed by him before his conviction for the offense above referred to." This pardon, it would seem, was granted expressly that Davis might appear as a witness, for the preamble recites: " Whereas it is desirable for the attainment of the ends of justice that he should be restored to citizenship." After this occurrence Davis being offered as a witness in a criminal case, was objected to on the ground that his disability had not been

removed by the paper offered; but this objection was over-ruled, and upon the point being discussed in the supreme court, the ruling was held to be error, Wallace, C. J., saying: "The governor might have pardoned Davis had he seen fit; he was not the less the subject of the executive power in that respect, because he had already suffered the punishment adjudged for his crime. Had he done so there is no doubt that his competency as a witness would have been thereby restored. But the executive act under review is not a pardon nor was it intended to be such. It did not purport to remove the guilt of Davis nor wipe away the infamy by the law of the land attaching upon him by reason of his conviction. It sought to restore him to all the rights of citizenship possessed by him before his conviction of the offenses ' above referred to,' and to so restore him while he yet remained a convicted felon and with the consequent legal infamy attaching by law to that status. The stain of his iniquity, flowing from his conviction, is still left upon him by the executive. The judgment of the law upon that fact is that the credit of his oath is so absolutely and effectually destroyed that he cannot be trusted to testify at all, that it is not to be hoped that he will speak the truth, but it must be conclusively assumed that he will not. If the judgment be reversed the disability is of course necessarily removed; if the offense be pardoned the same consequence, too, would follow. But so long as the judgment remains the guilt it fixes upon the convict is not taken away, and the disability necessarily remains; they are legally inseparable." *People v. Bowen,* 43 Cal. 439; *s. c.,* 13 Am Rep. 148. To the same effect is *Blanc v. Rodgers,* 49 Cal. 15; see also *State v. Foley,* 15 Nev. 64; *s. c.,* 37 Am. Rep. 458.

In Alabama certain persons had been fined, had paid the fine, and the legislature had passed an act to return the amount thus paid by them. In considering this act Goldthwaite, J., observed: "By article 4, section 11 of the constitution of Alabama, the power to remit fines and forfeit-

ures is given to the governor, and by the second article the powers of the government are divided into three distinct departments, the legislative, executive and judicial, and no one of these departments or persons belonging thereto can exercise any power properly belonging to either of the others unless expressly directed or permitted by the constitution.     *     *     The only question is whether the act referred to is directly or indirectly an attempt to remit a fine.   For if it be so, the mode or manner in which it is to be done is entirely immaterial.   It is the right which the constitution denies, without reference to the mode in which it may be exercised.     *     *     It is the substance of the thing we must look at, and certainly it never could have been the intention of the framers of the constitution to prohibit the legislature from remitting a fine, and yet allow that body to accomplish the same result by compelling the fine when paid to be refunded.     *     *     This is the case here; certain persons have been fined; it is not pretended that the fine has been remitted by the governor.   It is conceded that the legislature has not the authority to remit; but after payment it is contended that body may legitimately refund the fines.   To sustain this position would be to allow one department of the government to trench upon the power of another, and to defeat the purpose which the constitution contemplated in confining the pardoning power to one branch of the government, by permitting it to be indirectly exercised by another." _Haley v. Clark_, 26 Ala. 439.

In this State similar views have been expressed.   The legislature passed an act relieving all persons then indicted for selling liquor prior to December 15th, 1856, upon condition that they paid all costs and a fee of $2, to the circuit attorney, when it should be the duty of the circuit judge to order such cases to be dismissed.   Scott, J., in delivering the opinion of the court, after observing that the powers of the government were divided into three distinct departments, etc., and that the pardoning power was vested

in the chief executive, remarked: "There can be no question as to the nature of the act under consideration; it is as effectually a pardon as though it were one in form under the great seal of the State. Its being clothed with the forms of legislation cannot vary its nature and effect. If such laws are warranted by the constitution, it is plain that the power of granting pardons is as fully in the general assembly as though it had been in express terms conferred on that body. * * Here is a prosecution depending in court, and the legislature comes in and orders the party to be released from it. What is that in effect but a judgment of aquittal?" And the act was held unconstitutional, both as trenching upon the pardoning power of the executive and the functions of the courts. *State v. Sloss,* 25 Mo. 291.

It will thus be seen that if the disabilities which the statute annexes to the commission of certain offenses constitute part and parcel of the judgment, the legislature cannot exscind a part thereof, that nothing but a full pardon of the crime itself makes the convict a new man and re-habilitates him with his former civil rights.

But it may be conceded that the disabilities do not form a part of the judgment, and yet the result reached is nowise altered, if it be true that nothing short of a full pardon or a reversal of the judgment can restore the convict to that which he has lost. That the deprivation of all civil rights is a punishment of great severity, cannot be denied; nor can it be denied that but for the judgment such deprivation, such punishment, would not and could not have been inflicted. "Punishments not corporal are fines, forfeitures, suspension or deprivation of some political or civil rights, deprivation of office and being rendered incapable to hold office." 2 Bouvier Law Dict. In order to see this definition fully exemplified, it is only necessary to turn to the cases of *Cummings v. State,* 4 Wall. 277, and *Ex parte Garland,* 4 Wall. 333. If, then, the act of the legislature relieves a convict of a part of the pun-

ishment, it is, *pro tanto*, a judgment of acquittal or *pro tanto* a pardon, either of which is, and both of which are, outside of the legislative domain. And the assertion of power on the part of the law-making branch of the government to abate one jot or one tittle of the punishment which the law through its agents, the courts, had previously inflicted, is necessarily and logically an assertion of the power to abate the entire punishment or to absolve or free the party adjudged to suffer that punishment from all its pains, penalties, incidents and consequences. Tested by the principles announced in the authorities I have cited, it seems very certain that section 1378, as amended, cannot operate on past transactions, even if so intended by the legislature

But another reason has just occurred why that section was not intended to operate retrospectively. Section 26 of chapter 207 of the General Statutes, has now become section 1671 of the Revised Statutes 1879, without change. That section in express terms provides that when any person shall be sentenced upon conviction for any offense and is thereby disqualified, according to the provisions of this law, to be sworn as a witness, etc., etc., such disabilities may be removed by a pardon by the governor, and not otherwise, referring to the succeeding section, where an exception is made in favor of minors. Now the retention in the section quoted from of the words, "to be sworn as a witness," and forbidding that disability from being removed, save by a pardon by the governor, is only reconcilable with the single hypothesis that section 1378 was not designed to act except upon future transactions. For otherwise, why retain a useless prohibition against the disability of convicts being removed except by pardon, when such disability had been universally removed by cotemporaneous legislation?

Nor will it do to say that the omission in question may be justified on the ground that it was a mere alteration in the rules of evidence, or change in the method of procedure. Doubtless the legislature may alter the rules of

evidence, so as to enable parties to testify in existing causes of action, where they could not do so before—as was done in *Rich v. Flanders*, 39 N. H. 323. But it is conceived that a marked distinction is to be taken between a legislative act which enables persons to testify who theretofore were unable to testify at common law, and a legislative act which assumes to do more than this, which assumes to make a person competent as a witness, who, theretofore, was rendered incompetent by a judgment of conviction of a crime, which crime remains unpardoned, and which judgment remains unreversed. In the former case, the law-making power is engaged in its legitimate calling of facilitating the ordinary business of the courts; in the latter, that of arrogating to itself judicial functions and usurping executive powers, which, as already seen, it is altogether incompetent for the legislature to do. And even in cases where no judgment of a court debars legislative interference, authorities are not lacking to show that a limit exists which the legislature may not transcend, though it be in regard to the rules of evidence. Thus it has been ruled that an act authorizing conviction on the unsupported testimony of an accomplice on whose evidence alone no conviction could occur at the time the offense was committed, could not be applied in the trial of that offense. *Hart v. State*, 40 Ala. 32. And where a statute making that evidence which was not evidence before, is passed to go into effect at a future day, one who commits a crime after its passage, but before it goes into effect, cannot be tried and punished under it. *State v. Bond*, 4 Jones Law 9.

Taking the view of the point in hand which has been taken, it is unnecessary to discuss the question whether the repeal of the statute respecting the disqualification of the witness revived the common law in that regard, as has been contended on behalf of the defendant, and if it were the ruling would be adverse to such contention. *State v. Slaughter*, 70 Mo. 484; *State v. Boogher*, 71 Mo. 631.

For the error in admitting Miller's testimony the judgment should be reversed.

## II.

There was error in admitting the affidavit of the witness Canfield; the proper foundation therefor had not been laid, indeed no foundation at all. The affidavit differed very materially from the deposition in respect to the distance at which Canfield was at the time the fatal shot was fired. The prosecuting attorney did not attend at the place of taking the depositions, and if he had been there, and had desired to discredit the witness by reason of any discrepancy between her deposition and her affidavit, the latter, or in case the original could not be obtained, a certified copy thereof should have been produced, (*Reg. v. Shellard*, 9 C. & P. 277,) and the witness interrogated touching the same in the ordinary way. The most obvious dictates of fairness require this course to be pursued in order to prevent the witness from being unfairly dealt with by affording no opportunity for the explanation of apparently contradictory statements. The authorities make no distinction in this regard between written and verbal statements, (1 Greenleaf Ev., §§ 461, 462,) nor can any difference resting on principle be observed between a paper constituting one of the files of a court, and any other paper statement made by the witness to be interrogated. *Davis v. Davis*, 9 C. & P. 253. So far has the doctrine which requires that opportunity be given the witness for explaining or reconciling apparently conflicting statements been pushed that it has been ruled that when a letter was written after a deposition has been taken, and so it was impossible to call the attention of the witness to it, still that this did not relax the rigor of the rule, but that the party desirous of impeaching the witness must sue out a new commission, and examine the witness as to such contradictory statement. *Gregory v. Cheatham*, 36 Mo. 155.

### III.

Under the rulings in this State a witness may be impeached not only by a general reputation as to veracity, but the inquiry may extend to the general moral character or reputation of the witness. *State v. Shields,* 13 Mo. 236; *State v. Breeden,* 58 Mo. 507; *State v. Hamilton,* 55 Mo. 520; *State v. Clinton,* 67 Mo. 386; *State v. Miller,* 71 Mo. 590. And this ruling has been made in cases as to the general reputation of a female witness respecting chastity. Similar rulings have been made in some other states. *Commonwealth v. Murphy,* 14 Mass. 387, and cases cited; 1 Greenleaf Ev., (14 Ed.) § 461, in note. But evidence as to specific acts is held inadmissible. 1 Greenleaf, § 461. Evidence as to the general moral character of the witness being admissible, it must follow that anything showing deterioration of that general moral character or reputation is also admissible. For this reason evidence showing that the general reputation of Canfield was that of a common drunkard, was competent. It would seem that if it would be competent to show that a female witness had a general reputation for unchastity, then it would be competent to show that by such general reputation she had also descended into the yet deeper depths of miscegenous prostitution.

### IV.

Evidence in corroboration of a witness prior to attack or impeachment, is obviously inadmissible. *State v. Thomas,* 78 Mo. 327. If, however, such attack be made on the character of the witness, it is then admissible to prove that the witness has made statements consistent with those made as a witness. *March v. Harrell,* 1 Jones (N. C.) 329; *French v. Merrill,* 6 N. H. 465; *Coffin v. Anderson,* 4 Blackf. 395; *Jackson v. Etz,* 5 Cow. 314. And it is also held that for a similar corroborative purpose evidence is admissible of what the witness swore at a former trial. *Henderson v. Jones,* 10 S. & R. 322. Taking this to be the correct doctrine, and it is amply supported by authority, then the testimony of

Montgomery as to what Canfield swore at a former trial would have been admissible, as well as of other witnesses as to prior consistent statements. But this testimony seems to have been introduced anticipatory of an attack on the character of Canfield by the State, and, therefore, was clearly inadmissible.

### V.

The next point for discussion is as to the right of the policeman to arrest the defendant. Mere belief on the part of Jones that the defendant had been guilty of an offense, or was then engaged in the commission of one, if such belief had no basis of fact or circumstances on which to rest, would not authorize him to attempt an arrest.

Bishop says: "What is a reasonable cause for suspicion is a question of law; but the jury determines the fact whether or not it exists in the circumstances of a particular case. * * If a person is walking the streets at night and the indications are that he has committed a felony, watchmen and beadles have authority at the common law to arrest and detain him in prison for examination, though the proof of an actual felony committed may be wanting." 1 Crim. Prac., § 182. And he cites among others the case of *Lawrence v. Hedger*, 3 Taunt. 14, where a watchman arrested a man in the streets of London about ten o'clock at night with a bundle in his hand, as to the contents of which he would not or could not tell, and he was held properly arrested and that no action could be maintained against the watchman. Heath, J., observing: "At every Old Bailey sessions numbers of persons are convicted in consequence of their being stopped by watchmen while they are carrying bundles in this way." And Chambre, J., said: "In this case what do you talk of groundless suspicion? There was abundant ground of suspicion here; we should be very sorry if the law were otherwise." The "indications" of a crime having been committed in the case at bar were much stronger than in the case just

mentioned, and were properly left to the jury for their determination whether or not the circumstances relied on to prove the existence of reasonable suspicion existed. Wharton says that reasonable suspicion " may be treated as convertible with that of probable cause, as laid down in civil actions of malicious prosecution." Wharton Crim. Plead. and Prac., § 9. And elsewhere he reiterates the same view. 1 Wharton Crim. Law, § 430. It is unnecessary to say whether this statement is entirely accurate. In *Commonwealth v. Pleeby,* 14 Gray 65, a distinction appears to have been taken between a civil suit for an act done and a criminal prosecution for the same act. In that case the law required the policeman to arrest for the offense of intoxication. An arrest was made on one occasion for that offense, but it turned out that the party arrested was not intoxicated, and thereupon the officer was indicted for an assault and battery; and it was ruled that although the defendant, in a civil action, would have had no justification for the arrest, yet that he had a good defense in the criminal prosecution, Hoar, J., remarking: " We, therefore, feel bound to decide that the defendant, being required by his official duty to make the arrest if the fact of intoxication existed, and acting in a matter which did not admit of absolute certainty, if he acted in good faith, upon reasonable and probable cause of belief, without rashness or negligence, is not to be regarded as a criminal because he is found to, have been mistaken."

But treating probable cause as the legal equivalent of reasonable suspicion, how is the former defined? It is said to be " a reasonable ground of suspicion, supported by circumstances sufficient to warrant a cautious man in believing that the party is guilty of the offense." *Munns v. Dupont,* 3 Wash. C. C. 31. Or, as it is elsewhere defined: "A deceptive appearance of guilt arising from facts and circumstances misapprehended or misunderstood, so far as to produce belief." *Smith v. Ege,* 52 Pa. St. 419. And it has been ruled that where the facts and circumstances showing

probable cause are contested, the jury should be instructed what is necessary to be found in order to establish probable cause in law.    *Weinberger v. Shelly*, 6 W. & S. 336.

## VI.

As this cause is to be re-tried, on its return for that purpose, the trial court should substitute the words, " reasonable suspicion" or " probable suspicion," for the word " believed," as approved on a former occasion.    This course will free the instruction from any objection on that point, and constitute an adherence to established precedents, always safe to follow.

## VII.

It is strenuously contended that the State should not have been allowed to prove that the butter was stolen, on the ground that the butter was not discovered to have been stolen until the next morning after the homicide occurred. Though this is true, yet still, evidence of the theft of the butter was admissible.    It is a matter of common experience that those who engage in the commission of crime, especially in that of theft, while yet in the possession of the fruits of that crime and while engaged in carrying away the thing stolen, act in a manner altogether different from those engaged in honest pursuits.    It is established in the present case beyond dispute that the butter was stolen, and the evidence tends to show that one of those who stole the butter shot the officer.    The evidence of the larceny was, therefore, admissible on the ground already stated, that of furnishing "indications" to the officer by the manner and demeanor of the criminals possessed of the fruits of the crime that a theft had been committed; and such evidence was also admissible, for the additional reason as showing a motive—that of escape from arrest and punishment on the part of him who first committed the larceny and afterward the homicide.

## VIII.

Under the ruling in the *State v. Adams*, 76 Mo. 355, the competency of threats made is not affected by their nearness or remoteness, and the authorities cited for the State show that the threats made by defendant " against police-men," were admissible.  Mr. Wills says :  " It is not uncommon with persons about to engage in crime to utter menaces or to make obscure and mysterious allusion to purposes and intentions of revenge, or to boast to others whose standard of moral conduct is the same as their own, of what they will do, or to give vent to expressions of revengeful purposes, or of malignant satisfaction at the anticipated occurrence of some serious mischief.  Such declarations or allusions are of great moment, when clearly connected by independent evidence with some subsequent criminal action.  The just effect of such language is to show the existence of the disposition from which criminal actions proceed, to render it less improbable 'that a person proved to have used it would commit the offense charged, and to explain the real motive and character of the action." Wills on Cir. Ev., top p. 62.  In *Stewart's case* evidence was admitted that he had said that " he hated all the name of Campbell."  19 State Trials 100.  And vague threats, not against any particular person, have often been admitted, and are competent evidence.  ·*Rex v. Barbot*, 18 State Trials 1251 ; *Benedict v. State*, 14 Wis. 423.  In a comparatively late case in this State a witness was allowed to testify that she heard the defendant say a short time before the homicide, " I'll kill him before day, G—d d—n him," without calling any name.  It was held admissible.  *State v. Guy*, 69 Mo. 430.

## IX.

The court very properly refused to make any distinction between testimony given *viva voce* and that given by deposition.  For such an error as this is in substance, the

judgment in *Underwood's case* was reversed.    75 Mo. 230.

For the errors aforesaid, the judgment must be reversed and the cause remanded.    All concur, except HENRY, J.

HENRY, J., DISSENTING.—I concur in the reversal of the judgment, but dissent from so much of the foregoing opinion as holds that the evidence to prove the theft committed by the accused was admissible in this prosecution.    Whether the defendant was guilty or innocent of the theft, was not in issue.    The sole question is, was the officer justified, by appearances then present, or knowledge then in his possession, in attempting the arrest?    The accused could not have introduced evidence to prove his innocence of the theft, nor could the officer have justified the arrest of the prisoner on what had previously occurred of which he was ignorant.    Cases cited by appellant's counsel fully sustain the doctrine for which he contends.    That the conduct of thieves and other law-breakers generally affords grounds of suspicion, as asserted in the opinion of the court, may be true, and on such exhibition the officer must justify, and not upon the fact of guilt of which, when he attempts the arrest, he was ignorant.    If the conduct of the accused and facts within the knowledge of the officer, or of which he has been informed, are not sufficient for his justification, he cannot trust to evidence of facts of which he had no knowledge or information.    Nor can it be admissible, as the court holds, to prove a motive on the part of the accused to take the officer's life.    That motive sufficiently appears from the facts which transpired at the homicide.    If Grant killed the officer it was evidently to prevent an arrest.    The motive was apparent, and the fact of the theft would throw no light whatever upon the motive of the accused, and could only tend to prejudice the jury against him.